DONALD R. CAMREN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Camren v. Commissioner
Docket No. 7434-79
United States Tax Court
T.C. Memo 1981-485; 1981 Tax Ct. Memo LEXIS 263; 42 T.C.M. (CCH) 982; T.C.M. (RIA) 81485; September 2, 1981. Donald R. Camren, pro se. David W. Otto, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined a $ 1,544.07 deficiency in petitioner's 1977 income tax. The sole issue is *264 whether petitioner was away from home within the meaning of section 162(a)(2) [1] while he was employed in Joseph City, Arizona, during 1977. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Donald R. Camren resided in Phoenix, Arizona, when he filed his petition. At the time of trial petitioner had been an electrician for over 40 years. Prior to 1971 petitioner and his wife [2] resided in Galesburg, Illinois, where petitioner practiced his trade as a member of the International Brotherhood of Electrical Workers (I.B.E.W.), Local 34 of Peoria, Illinois. Both petitioner and his wife have sinus problems. In 1971 the employment opportunities for petitioner in Illinois were scarce. These two factors led petitioner and his wife to investigate a move to Phoenix. In 1971 they made a trial trip to Arizona and, *265 as a result, decided to move permanently to Phoenix. In 1972 petitioner and his wife purchased a home in Phoenix which has since been their permanent residence. In 1976 petitioner searched in vain for work in the Phoenix area; he was unemployed from January 1976 through August 1976. In September 1976 Local 518 of the I.B.E.W. located in Globe, Arizona, assigned petitioner to the Bechtel Power Corporation construction project at Joseph City, Arizona, [3] known as the Cholla Power Plant Project. [4] When petitioner commenced employment with Bechtel he made no commitment as to the length of his employment nor was he told anything by Bechtel concerning its duration. *266 The Cholla Power Plant is owned and financed by Arizona Public Service Corporation ("APS"). [5] It began producing electricity in 1962 with one coal-fired generator. In 1973 APS started work on an expansion program of the Cholla Power Plant (the "Cholla Project"). At that time plans for the Cholla Project called for the construction of three additional coal-fired generating units (Units 2, 3 and 4). Expected completion dates for Units 2, 3 and 4 were 1976, 1977 and 1978, respectively. By December 31, 1975, however, several factors (including reductions by APS in its annual planned capital expenditures for plant construction) set back the scheduled completion dates for Units 2, 3 and 4 to 1978, 1979 and 1980, respectively. By 1976 construction had already begun and was continuing on Units 2 and 3. Construction on Unit 4 began that year. In 1976 APS added plans for a fifth unit (Unit 5) with a scheduled completion date of 1983. [6]
By the end of 1977 start up tests were being *267 run on Unit 2 with June 1978 as the expected date for it to go on line. As of December 31, 1977, APS' construction schedules called for completion of Unit 3 in 1979 and of Unit 4 in 1980. One of the purposes behind the staggered dates for commencing construction and scheduled completion of the units was to permit workers, upon completion of their stage of the construction on one unit, to move on and begin their stage on the next unit. Among other things, this allowed Bechtel to maintain a steady number of employees. From 1973 through April 1980, construction on one or more units at the Cholla Project was continuous. The scheduled construction planned for the Cholla Project was public knowledge, and petitioner knew about it. During 1977 Bechtel employed approximately 1,600 workers on the Cholla Project, including approximately 400 electricians. In 1977 an electrician performing satisfactory work had good prospects for continuous employment provided he avoided a seasonal reduction of electricians that took place during the winter. [7]
In September 1976 APS received *268 approval for a 13.8 percent interim rate increase. APS later petitioned the Arizona Corporation Commission to make the interim increase permanent. In early 1977 the Arizona Corporation Commission held hearings on the proposed rate increase. During these hearings APS indicated that failure to allow the requested increase might result in a severe cutback in APS' current and planned construction projects. Petitioner knew of this possibility while working on the Cholla Project. In August 1977 the interim increase became permanent and an additional rate increase was allowed. When petitioner began working on the Cholla Project, Bechtel assigned him to a wire pulling crew [8] then working on Unit 2. Shortly after beginning work petitioner moved his trailer to a mobile home site in Joseph City and lived in it during his entire employment on the Cholla Project. Petitioner frequently returned to Phoenix on weekends, and occasionally his wife traveled to Joseph City to visit him. The climate in Joseph City was not as favorable for petitioner's sinus condition as the Phoenix climate. At the time petitioner took the job on the Cholla Project, he intended to remain there only until he secured *269 other work closer to Phoenix or Tucson. Petitioner maintained contact with the local branches of the I.B.E.W. in Phoenix and Tucson with the hope of obtaining a job in one of those areas while he was working in Joseph City. In January 1978 petitioner's wire pulling crew completed its work on Unit 2, and was assigned to the wire reel yard where petitioner continued working until April 1978 when he voluntarily left to take a job in Tucson. During the twenty months (September 1976 through April 1978) that petitioner worked on the Cholla Project, his employment was continuous. Also during 1977 two other major construction projects employing *270 electricians were under the jurisdiction of Local 518. These were the St. John's Coronado Plant and the Salt River Project. In the event either of these two projects faced slow-downs or work stoppages, the number of electricians belonging to Local 518 looking for work would increase. On his 1977 joint return petitioner deducted $ 6,183.20 as employee business expenses for meals and lodging incurred in connection with a "[t]emporary job assignment away from home." In his notice of deficiency respondent disallowed petitioner's entire claimed deduction. OPINION This case presents the often litigated question whether the costs paid by a construction worker for meals and lodging while at a major construction project, some distance from his residence and family, are expended while traveling away from home. At trial respondent conceded that petitioner met all the substantiation requirements of section 274(d), and thus, if petitioner was away from home, he is entitled to the claimed deductions. Petitioner contends that he is entitled to the claimed deductions as traveling expenses incurred while away from home because his assignment on the Cholla Project was temporary in nature *271 and his "home" for tax purposes was Phoenix. Respondent, on the other hand, asserts that the claimed traveling expenses were nondeductible personal living expenses resulting from petitioner's desire to maintain his residence at a place other than the location of his principal place of business. We agree with respondent. Personal living expenses are ordinarily nondeductible. Sec. 262. Section 162(a)(2), [9] however, allows a taxpayer to deduct certain living expenses if they are traveling expenses paid or incurred "while away from home in the pursuit of a trade or business." In Commissioner v. Flowers, 326 U.S. 465, 470 (1946), the Supreme Court set forth three prerequisites to the deductibility of traveling expenses under the predecessor to section *272 162(a)(2): First, the expense must be reasonable and necessary; second, it must be incurred while away from home; and third, it must be incurred in the pursuit of a trade or business. The purpose of allowing deductions for living expenses for a taxpayer who is away from home is "to mitigate the burden of the taxpayer two, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." Kroll v. Commissioner, 49 T.C. 557, 562 (1968). The parties here agree that the first and third requirements of Commissioner v. Flowers have been met. Thus, we are concerned here only with whether the expenses incurred by the taxpayer while residing in his travel trailer in Joseph City during 1977 were incurred while away from home. This Court has consistently applied the standard that for purposes of section 162(a)(2) "home" means the vicinity of the taxpayer's principal place of business or employment and not the location of his principal residence. Commissioner v. Stidger, 386 U.S. 287, 290-291 (1967); Mitchell v. Commissioner, 74 T.C. 578, 581 (1980). The *273 Ninth Circuit, to which an appeal in this case would lie, has not been as consistent, see Frank v. United States, 577 F. 2d 93, 97 n. 3 (9th Cir. 1978), but has recently explained that its many prior decisions should be read, at most, as having * * * developed the rule that, in general, as between various possible 'abodes,' the abode or at least the locale of the abode which is located in the vicinity of the taxpayer's principal place of business or employment, or as close thereto as possible, will be considered the taxpayer's tax home for purposes of the travel expense deduction of section 162(a)(2). [Footnote omitted.] Coombs v. Commissioner, 608 F. 2d 1269, 1275 (9th Cir. 1979). Since under either of these general rules petitioner's home during 1977 for purposes of section 162(a)(2) was the Joseph City area, petitioner relies on an exception to the general rule, namely, that his employment was temporary. Under such circumstances, the taxpayer's residence, not the temporary place of employment, is considered to be his home. See Peurifoy v. Commissioner, 358 U.S. 59, 60 (1958). Whether a taxpayer's employment is "temporary" *274 as opposed to "indefinite," "substantial" or "permanent" is a question of fact. Id. at 60-61. In Mitchell v. Commissioner, supra, we explained our approach to this exception: A place of business is a "temporary" place of business if the employment is such that "termination within a short period could be foreseen." Albert v. Commissioner, 13 T.C. 129, 131 (1949). See Michaels v. Commissioner, 53 T.C. 269, 273 (1969). Or, viewed from the other side of the coin, an employment is for an "indefinite," "substantial," or "indeterminate" period of time if "its termination cannot be foreseen within a fixed or reasonably short period of time." Stricker v. Commissioner, 54 T.C. 355, 361 (1970), affd. 438 F. 2d 1216 (6th Cir. 1971). "Further, if the employment while away from home, even if temporary in its inception, becomes substantial, indefinite, or indeterminate in duration, the situs of such employment for purposes of the statute becomes the taxpayer's home." Kroll v. Commissioner, 49 T.C. 557, 562 (1968). * * * Id. at 581. [10]
*275 In the present case it is clear that during 1977 termination of petitioner's employment on the Cholla Project could not be foreseen within a fixed or reasonably short period of time. Local 518 of the I.B.E.W. assigned petitioner to the Cholla Project in early September 1976. Prior to that time petitioner had been unemployed for eight months because he was unable to obtain work in either the Phoenix or Tucson area. Petitioner testified that throughout his employment on the Cholla Project he maintained contacts with the Phoenix and Tucson locals of the I.B.E.W. and that he intended to leave the Cholla Project as soon as employment in one of those areas became available. By January 1, 1977, petitioner had been unable to find employment in either of those areas for a full year. This, we believe, is sufficient to conclude that petitioner had no reasonable expectation of employment in those areas within a short time. This is especially so in light of petitioner's inability to articulate any legitimate basis for harboring a reasonable expectation of finding work in one of those areas within a short period of time. [11]
*276 Furthermore, we find that by January 1, 1977, petitioner, after having worked on the Cholla Project for four months, was generally apprised of the fact that his employment there could reasonably be expected to continue indefinitely. Petitioner knew the size of the Cholla Project, the approximate completion date for Unit 2 (i.e., 1978), that the staggered expected completion dates for Units 3, 4 and 5 would provide job rollover from one unit to the next (subject, perhaps, to a short lapse), and that a qualified electrician performing satisfactory work had every reason to expect continuous employment (subject to a possible seasonal layoff). The record establishes that in 1977 petitioner had a reasonable expection for continued employment lasting, if necessary, for an indefinite or substantial time. The facts upon which petitioner relies do not compel a contrary result. First, petitioner claims that he only intended to remain working on the Cholla Project until he secured work in either the Phoenix or Tucson area. We need not decide whether such an intention alone suffices to categorize an employment as temporary. Even assuming that it does, petitioner does not prevail here *277 because, at a minimum, petitioner must have a reasonable expectation of securing work in the Phoenix or Tucson area within a reasonably short time. As discussed earlier, the facts presented belie the reasonableness of petitioner's expectations. [12]
*278 Second, petitioner identifies the following as contingencies which could result in the termination of his employment: (1) that he was not a member of Local 518 and might be required to forfeit his job for an unemployed member; (2) that there were seasonal reductions of electricians during the winter; and (3) that APS needed approval of its rate increases to continue its present level of construction. These contingencies, however, are not persuasive. As was the case with petitioner's intention to leave as soon as other employment became available, petitioner never satisfactorily established a reasonable expectation of the occurrence of any of these events. In fact, petitioner was never bumped for a member of Local 518 nor was he laid off during the winter months. In addition, APS apparently received all requested rate increases. We find that these contingencies, like so many other contingencies inherent in any job, would merely terminate a job of otherwise indefinite duration absent a high probability of their occurrence. Third, petitioner's sinus condition and family, social and financial ties to Phoenix only further support the result reached here. The primary purpose of *279 section 162(a)(2) is to provide relief to taxpayers who, for business reasons, must incur duplicate living expenses. Kroll v. Commissioner, supra. The reasons cited by petitioner are personal in nature, not a result of the exigencies of petitioner's business. In conclusion, under this Court's approach to section 162(a)(2) "away from home" expenses, petitioner's living expenses incurred in Joseph City during 1977, are nondeductible personal expenses. Sec. 262.
Finally, there is some confusion over whether the Ninth Circuit is in agreement with the approach used by this Court. [13] In Mitchell v. Commissioner, supra, we cited the Ninth Circuit's opinion in Harvey v. Commissioner, 283 F. 2d 491 (9th Cir. 1960), as establishing the following test: *280 An employee might be said to change his tax home if there is a reasonable probability knowntohim that he may be employed for a long period of time at his new station. What constitutes "a long period of time" varies with circumstances surrounding each case. If such be the case, it is reasonable to expect him to move his permanent abode to his new station, and thus avoid the double burden that the Congress intended to mitigate. * * * Id. at 495. Subsequent Ninth Circuit opinions have cited this standard with approval. [14]Coombs v. Commissioner, 608 F. 2d 1269, 1276 n. 3 (9th Cir. 1979); Wills v. Commissioner, 411 F. 2d 537, 541 (9th Cir. 1969) (Harvey does not control the situation of a baseball player whose team is located in Los Angeles but whose family resides in Spokane where the player could reasonably expect his employment to continue); Stidger v. Commissioner, 355 F. 2d 294, 298 (9th Cir. 1965), revd. 386 U.S. 287 (1967); Doyle v. Commissioner, 354 F. 2d 480, 482 (9th Cir. 1966) (the indefinite nature of a taxpayer's employment although not a controlling factor may *281 be a significant one); Wright v. Hartsell, 305 F. 2d 221, 224 n. 1 (9th Cir. 1962) (explained that the key to the Harvey test is that the taxpayer should not be expected to change his residence, and thus avoid duplicate living expenses, unless he expects to be employed for a reasonably long period of time). Harvey v. Commissioner, supra, even if perceived as establishing a different test in the Ninth Circuit, produces the same result in this case. If the proper inquiry is whether there was a reasonable probability known to petitioner that he might be employed for a long period of time on the Cholla Project, then we find that respondent must prevail. By January 1, 1977, petitioner *282 had been unable to secure work in either the Phoenix or Tucson area for a full year. Petitioner knew that his employment on the Cholla Project could be expected to last for an indefinite period. Since this was known to petitioner and he failed to establish any grounds for not reasonably expecting to remain on the Cholla Project for a long period of time, petitioner's 1977 living expenses in Joseph City are not deductible under section 162(a)(2). The Ninth Circuit does not ask in Harvey whether it is reasonable to expect the taxpayer to move. Rather, if the taxpayer reasonably expects to be employed for a long period of time, the Ninth Circuit assumes that it is reasonable to expect him to move. Accordingly, under Harvey it is reasonable to expect petitioner to move to the Joseph City area and avoid the duplicate living expenses. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the year in issue.↩
2. Clara M. Camren, petitioner's wife, filed a joint 1977 tax return with petitioner, and she was included as a taxpayer in respondent's notice of deficiency. Clara M. Camren, however, is not a party in this proceeding.↩
3. Joseph City is located in northern Arizona approximately 213 miles from Phoenix and 80 miles from Flagstaff, Arizona. ↩
4. Petitioner never joined Local 518--the local union having jurisdiction over the Cholla Project. Instead, petitioner obtained employment at the Cholla Project through a referral from Local 34 to Local 51. Members of Local 518 had priority on the jobs in its jurisdiction. Thus, although Bechtel would not lay petitioner off to make room for a member of Local 518, the union managed to keep its members employed over the so-called "travelers"--members of other locals of the I.B.E.W. Thus, if necessary, it was expected that petitioner would quit his job to make room for a member of Local 518.↩
5. APS is a public utility providing service to Arizona under license from the Arizona Corporation Commission.↩
6. Construction plans for Unit 5 were delayed indefinitely in 1978 or 1979.↩
7. During the winter months Bechtel reduced its work force of 400 electricians by approximately one-fourth.↩
8. Petitioner's wire pulling crew consisted of approximately 10 electricians. This crew installed cables varying in length from 10 feet to over 1,500 feet. The installation process involved pulling the wire through manholes, underground conduit ducts, pull boxes, cable trays and conduits. Once the cables are pulled into place petitioner's job was complete, and other crews of electricians labeled the wires, connected them to their proper terminals and tested the connections. There were approximately 4 wire pulling crews working on Unit 2.↩
9. Section 162(a) provides: There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- (2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business * * *.↩
10. Also, even if it is known that a particular job may or will terminate at some future date, that job is not temporary if it is expected to last for a substantial or indefinite period of time. Ford v. Commissioner, 227 F. 2d 297 (4th Cir. 1955), affg. a Memorandum Opinion of this Court; Jones v. Commissioner, 54 T.C. 734 (1970), affd. 444 F. 2d 508 (5th Cir. 1971); Cockrell v. Commissioner, 38 T.C. 470 (1962), affd. 321 F. 2d 504↩ (8th Cir. 1963).
11. For example, despite petitioner's testimony that he continuously searched for employment in the Phoenix and Tucson areas, there is no evidence that he had any offers or prospects of offers during this time.↩
12. We note that petitioner's reliance on Frederick v. United States, 603 F. 2d 1292 (8th Cir. 1979), and Blankenship v. Commissioner, T.C. Memo. 1979-366 (1979), is misplaced. The facts in Frederick established that the taxpayer had a reasonable expectation that the project on which he worked might be shut down. In addition, the seasonal cutback in the workforce in the winters ran between 50 and 80 percent, and, although the taxpayer was retained, he was the only worker in his crew of 15 to 20 workers who was retained. Blankenship is distinguishable by the key fact that there, weighing all the evidence, we found that the probabilities were that the taxpayer's employment would not last long. In addition, at the time the taxpayer commenced work there was no prospect or reasonable likelihood that it would continue for an indefinite or substantially long period of time, and nothing occurred thereafter to make the prospect more reasonable. In the present case we find, at a minimum, that by January 1, 1977, petitioner had a reasonable expectation of continued employment for an indefinite or substantial period. See also Babeaux v. Commissioner, 601 F. 2d 730↩ (4th Cir. 1979), revg. three Memorandum Opinions of this Court.
13. Compare Mitchell v. Commissioner, 74 T.C. 578, 582 (1980), which recognized a different approach with Hillgren v. Commissioner, T.C. Memo. 1980-101 (1980), which stated that the Ninth Circuit's approach is not significantly different than other courts. See also, Deblock v. Commissioner, T.C. Memo. 1980-277 (1980); Bullock v. Commissioner, T.C. Memo. 1980-135↩ (1980).
14. The Ninth Circuit is not the only court to look at the question of whether it is reasonable to expect the taxpayer to move to avoid duplicate living expenses. See Markey v. Commissioner, 490 F. 2d 1249, 1253 (6th Cir. 1974); Six v. Commissioner, 450 F. 2d 66, 69 (2d Cir. 1971). In fact, this Court has stated that our inquiry in effect asks just that question. Kroll v. Commissioner, 49 T.C. 557, 562↩ (1968).